**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Mary Smith, individually and as Special
Administrator of the Estate of James Perea,

     Plaintiff,

v.

Las Vegas Metropolitan Police Department,
et al.,

     Defendants

Case No.: 2:23-cv-00092-JAD-NJK

**Order Granting in Part Metro Defendants'
Motions for Summary Judgment**

[ECF Nos. 143, 144]

In June 2021, James Perea died while in the custody of the Las Vegas Metropolitan Police Department.  His mother, Mary Smith, sues Metro, its healthcare provider Wellpath Inc., and employees from both entities, individually and on behalf of Perea's estate.  She alleges that the individual defendants provided inadequate medical care and deprived her of familial association in violation of the Fourteenth Amendment of the U.S. Constitution and the equivalent clause in Nevada's Constitution.  She asserts that Metro and Wellpath[1] failed to train employees and maintained constitutionally inadequate policies, customs, and procedures for screening detainees with mental and physical illnesses and providing them with supervision and care.  And she brings state-law claims for wrongful death and neglect of a vulnerable person against all defendants.

---

[1] Wellpath was dismissed as a defendant in this case following discharge of its bankruptcy case, but it remains as a nominal defendant.

Metro and its corrections officers Donte Mitchell and Vanessa Mitchell move for summary judgment on all of Smith's claims against them. The Mitchells[2] contend that they properly monitored Perea and were not deliberately indifferent to his health, and that qualified immunity protects them from suit regardless. They also argue that Smith has not provided evidence to establish the standard of care owed to Perea, a deficit that they contend is fatal to her wrongful-death claim, and that Nevada's neglect-of-a-vulnerable person statute does not create an independent claim but rather a hook for special damages. Metro seeks dismissal on the municipal-liability claims against it, arguing that Smith has not shown that an individual officer violated Perea's rights, that its training is inadequate, or that any of its policies were unconstitutional. It also insists that it cannot be blamed for Wellpath's policies or practices.

I grant the Mitchells summary judgment on all of the claims against them. Their monitoring of Perea during the hours leading up to his death was not constitutionally inadequate and no clearly established law put them on notice that it could be. And Smith's wrongful-death and neglect-of-a-vulnerable-person claims fail because the evidence doesn't support a finding that the Mitchells breached any applicable standard of care.

I also grant partial summary judgment to Metro. Smith has not presented evidence that Metro was on notice of any substantial risk that the training, discipline, or supervision of its officers could cause the deprivation of Perea's constitutional rights. She has also failed to show that most of Metro's policies were constitutionally inadequate, with one exception. A reasonable jury could conclude that Wellpath's custom of understaffing CCDC's medical staff caused Perea's death and that Metro was aware of that custom and did not take action to mitigate the

---

[2] There is no indication in the record that these defendants are related. Nonetheless, I refer to them collectively as the Mitchells and individually by their first names for clarity. No disrespect is intended by doing so.

substantial risk of harm it could cause.  So this lone liability theory against Metro survives summary judgment.

**Background**

**A.    James Perea is booked at CCDC on July 10, 2021, and evaluated for suicidal thoughts and possible drug withdrawal.**

James Perea was arrested on an outstanding warrant in the early morning of July 10, 2021,[3] and was transported to the Clark County Detention Center (CCDC) in Downtown Las Vegas.[4]  Wellpath's medical staff screened him and he reported being homeless, experiencing hallucinations, and considering self-harm.  A provider noted that he seemed to be under the influence of an unknown substance.[5]

Because he mentioned suicidal thoughts and appeared to be on drugs, Perea was placed on suicide watch and recommended for placement in Module 2C.[6]  That module is a special-housing unit used primarily for detainees who have expressed suicidal ideation.  Each detainee gets his own cell with a call button to alert staff of emergencies, and CCDC policy requires that the on-duty officers conduct visual checks of each occupied cell every 15 minutes.[7]  The policy also requires that another officer be constantly watching the video surveillance footage for each cell in 2C.[8]

---

[3] ECF No. 144-1 (Perea's arrest report).

[4] *Id.*

[5] ECF No. 144-5 at 25 (Wellpath records).

[6] ECF No. 149-2 at 40–42 (Wellpath records).

[7] ECF No. 144-6 at 5 (Metro's Detention Services Division Standard Operating Procedure (SOP) 09.08.03–Special Housing Unit Operations).

[8] *Id.*

While Perea was waiting to be transferred from booking at around 11:00 a.m. on July 10th, defendant nurse Geneva Besey noticed him vomiting. Perea told Besey that "he [has smoked] over a gram of heroin daily for over a year, is feeling nauseated, and his body hurts."[9] Besey gave Perea medication and Gatorade and noted that he was then able to finish his lunch without vomiting again.[10] Besey placed Perea on detox protocols, conducted a Clinical Opiate Withdrawal Scale (COWS) assessment, and referred him for placement in "detox housing."[11] Under the prison's detox protocols, medical staff must conduct COWS assessments on detoxing inmates at least three times a day,[12] and Besey explicitly ordered that Perea be monitored every 8 hours.[13] Yet, no medical record indicates that he was assessed again on July 10th.

**B.      Perea is housed in the suicide-watch unit and treated for vomiting a brown substance in the early morning hours of July 11th.**

Though medical staff recommended that Perea be assigned to a medical-observation unit because he was detoxing,[14] he was instead placed in an isolation cell in unit 2C. The record does not reflect when that transfer happened, but Metro records show that an officer conducted the first signs-of-life check on Perea in his 2C cell at 11:53 p.m. on July 10th.[15] At around 4:20 a.m.

---

[9] ECF No. 149-2 at 61.

[10] *Id.*

[11] *Id.* at 61–62.

[12] ECF No. 149-3 at 78:2–7 (depo. testimony of Wellpath's Rule 30(b)(6) witness Lori Ann Coleman). I cite to the original pagination, not CM/ECF's pagination, when referring to the deposition transcripts attached as evidence in this case.

[13] ECF No. 149-2 at 99.

[14] *Id.* at 62.

[15] ECF No. 144-11 at 2.

on July 11th, a correctional officer "noticed blood vomit" on the floor of Perea's cell while conducting a signs-of-life check and called Nurse Aynur Kabota to assess him.[16]

Kabota testified at her deposition that when she assessed Perea she noticed brown "jelly-like" vomit in his cell that she attributed to a gastrointestinal bleed.[17]  The "large amount of vomit" she observed prompted her to tell the officer to move Perea to the nearby medical unit.[18] Kabota messaged Shelley Ameduri, the nurse practitioner (NP) on duty that night, to update her on Perea's condition.[19]  Ameduri asked if Perea's vomit "was coffee ground or just brown" and Kabota responded, "just brown."[20]  Ameduri testified that she did not assess the vomit as being indicative of gastrointestinal bleeding because of Kabota's description.[21]  She also acknowledged that she did not go to Perea's cell to assess it for herself.[22]  Kabota testified that she asked Ameduri to do so, but Ameduri refused because she was "too busy."[23]  Kabota also testified that she recommended that Perea be sent to a local hospital but Ameduri did not do that because she was, again, too busy.[24]  Perea was returned to his cell an hour or so later.[25]

---

[16] ECF No. 144-9 at 2.

[17] ECF No. 149-6 at 55:12–18 (cleaned up).

[18] *Id.* at 56:10–12; *see also* ECF No. 144-27 at 158:4–12 (depo. transcript of Wellpath employee Hugh Rossett, testifying that the medical unit was "50 yards tops" from 2C and within a minute walk).

[19] ECF No. 144-26 at 3.

[20] *Id.*

[21] ECF No. 144-10 at 32:16–22 (testifying that a vomit from a G.I. bleed "has like a coffee ground type consistency").

[22] *Id.* at 35:16–18.

[23] ECF No. 149-6 at 60:15–18.

[24] *Id.* at 60:25–61:8.

[25] Smith alleges that the visual-check logs for Perea appear to be falsified because they show that checks were conducted while Perea was in the medical unit.  *See* ECF No. 149 at 8–9.  Even if I were to take that allegation as true for the purposes of resolving these motions, I do not find that potentially falsified checks while Perea was receiving care or throughout July 11th creates any

Medical staff conducted two additional COWS assessments throughout the day on July 11th—one at around 9:30 a.m., and another at around 3:00 p.m.[26] Both assessments reflected that Perea had few withdrawal symptoms.[27] At 3:30 p.m. Perea refused lunch and dinner, claiming that he was "detoxing and too sick to eat."[28] Fifteen minutes later, physician assistant Andrea Balogh spoke with Perea and reported that he told her he was drinking fluids and eating. Though he complained of being tired, Perea was "responding to questions appropriately" and agreed to continue the treatment plan of Gatorade and anti-nausea medication.[29]

**C.    Perea suffers medical distress and becomes unresponsive in the early morning of July 12th.**

Vanessa Mitchell conducted signs-of-life checks on Perea at least every 15 minutes from 10:39 p.m. on July 11th through 1:31 a.m. on July 12th.[30] Unfortunately, those checks did not coincide with the symptoms of medical distress he exhibited intermittently throughout the night. Video surveillance shows that at 12:51 p.m., Perea went to the sink to drink some water and promptly fell to the ground.[31] Seconds later, corrections officer Vanessa Mitchell entered the

---

genuine issue of fact related to the issues being adjudicated here. At a minimum, the video record reflects that when Perea was showing obvious signs of distress (vomiting or falling in his cell), visual checks were happening.

[26] ECF No. 149-2 at 94–97.

[27] *Id.*

[28] ECF No. 144-9 at 2.

[29] ECF No. 149-2 at 89–91.

[30] *See* ECF No. 144 at 24–25 (chart reflecting visual checks on the evening of July 11th through the morning of July 12th). I have carefully viewed the video footage of these checks and find that the chart provided in the Mitchells' brief—with the exception of omitting Vanessa's check at 12:51 a.m.—is an accurate summary of that evidence.

[31] ECF No. 144-12 at 12:51:50–53 (video-surveillance footage of 2C cell that Perea was housed in, manually filed with the court).

small room outside of Perea's cell—from that small room, Perea is visible through a window—to conduct a signs-of-life check.[32]  At that moment, Perea was sitting on the floor, and he looked up at the door to the room that Vanessa was in.[33]  Vanessa remained outside of Perea's cell for about a minute, during which time Perea doesn't show any signs of distress or signal Vanessa for help.[34]

At 1:17 a.m., Perea fell again, then sat up and moved to the bed.[35]  When Vanessa conducted her signs-of-life check at 1:19 a.m., Perea was laying on his mattress and appeared to be sleeping.[36]  Vanessa checked on Perea again at 1:31 a.m., Perea was sleeping on his mattress covered by a blanket.  While Vanessa was observing him, Perea moved his blanket off him, sat up, and looked toward the cell window.[37]

Perea's condition deteriorated rapidly after Vanessa's 1:31 a.m. check.  The video footage shows that he was disoriented and fell four times while attempting to move around the cell between 1:32 a.m. and 1:43 a.m.[38]  Perea stopped moving at approximately 1:44 a.m.[39]  At

---

[32] ECF No. 144-13 at 12:51:56 (video-surveillance footage of 2C corridor, manually filed with the court).

[33] ECF No. 144-12 at 12:51:56.  Smith alleges that the video footage shows Vanessa entering the room outside of Perea's cell "at the exact same time James is first seen falling."  ECF No. 149 at 10.  But that account is contradicted by the footage, which shows that Perea fell before Vanessa entered his cell.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  I find that the footage supports only the conclusion that Vanessa did not witness Perea fall.  I discuss the implications of this factual finding infra at 13.

[34] *Compare* ECF No. 144-13 at 12:51:56–12:52:54 *with* ECF No. 144-12 at 12:51:56–12:52:54.

[35] ECF No. 144-12 at 1:17:12–1:17:40.

[36] *Compare* ECF No. 144-13 at 1:18:50–1:19:04 *with* ECF No. 144-12 at 1:18:50–1:19:04.

[37] *Compare* ECF No. 144-13 at 1:31:45–1:32:08 *with* ECF No. 144-12 at 1:31:45–1:32:08.

[38] ECF No. 144-12 at 1:32:48–1:42:49.

[39] *Id.* at 1:44.00.

1:45 a.m., Vanessa entered the outer door to Perea's cell and, noticing that he was not moving, knocked on his cell door and shone her flashlight in his face in an attempt to elicit a response.[40] When she didn't get one, she called Don'te Mitchell, another officer on duty, over to assist because she was planning on entering Perea's cell.[41]  Vanessa called a medical-emergency code and entered the cell to begin chest compressions.[42]  Medical staff arrived shortly after, took Perea out of the cell, and attempted life-saving measures.  They were unable to resuscitate him, and Perea was declared dead at 2:33 a.m.[43]

The surveillance footage of the 2C Corridor also shows the actions of other officers assigned to 2C on the night of Perea's death.  Christy Snapp was assigned as the video monitor in that unit and was thus required to constantly monitor the video feeds of all 2C cells throughout her shift.[44]  The footage shows Snapp paying little attention to the video monitors during the night, and especially in the last 15 minutes of Perea's life.[45]  Don'te and another officer occasionally sit at the monitoring station and talk with Snapp, and at those times they do not appear to be reviewing the monitors either.[46]  After Perea's death, Metro's Internal Affairs Bureau conducted an investigation and concluded that Snapp had failed to maintain constant

---

[40] ECF No. 144-13 at 1:45:56; ECF No. 144-12 at 1:46:00–1:47:30; ECF No. 144-16 at 96:5–13 (depo. transcript in which Vanessa Mitchell recounts that, during that check, she looked for signs of life but didn't see any so she "started either banging, knocking on the door," "utilized [her] flashlight to shine . . . onto his face," and called Don'te over "because [she] knew [she] was going to have to enter the cell).

[41] ECF No. 144-13 at 1:46:45–1:47:00.

[42] ECF No. 144-16 at 96:13–14.

[43] ECF No. 144-17 at 4 (Metro's briefing memorandum about Perea's death).

[44] *See* ECF No. 144-6 at 5.

[45] *See generally* ECF No. 144-13.

[46] *See, e.g., id.* at 1:16:45–1:17:30; 1:43:11–1:46:56.

observation of the surveillance monitors and had failed to observe Perea's medical distress.[47] She received a written reprimand for that misconduct.[48]

**Discussion**

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[49]  If the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[50]  The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[51]  The court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[52]

**A.      The Mitchells are entitled to summary judgment on all of Smith's claims against them.**

*1.       A state actor's reckless disregard for a pretrial detainee's medical needs violates the Fourteenth Amendment.*

Smith's first cause of action alleges that Vanessa and Don'te Mitchell violated Perea's right to adequate medical care under the Fourteenth Amendment of the U.S. Constitution and

---

[47] ECF No. 143-20 at 19.

[48] *Id.* at 20.

[49] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[50] *Id.* at 323.

[51] *Id.* at 322.

[52] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

Article I, § 8 of the Nevada Constitution.[53]  The Mitchells move for summary judgment on this claim, contending that they did not act with deliberate indifference when monitoring Perea's cell, they did not cause Perea's death, qualified immunity bars the federal claim against them, and discretionary immunity bars the state claim.[54]  Smith responds that the video evidence creates a genuine dispute over whether the Mitchells saw Perea in distress before he became unresponsive and failed to intervene, and that their failure prevented him from receiving medical care that could have saved his life.  She also contends that clearly established law put the officers on notice that it was a constitutional violation to "stand idly by" while a detainee experiences medical distress, and that discretionary immunity doesn't apply to state constitutional claims.[55]

To prove a claim for inadequate medical care, a pretrial detainee must show that:

> (i) the defendant made an intentional decision with respect to the conditions under which the [detainee] was confined;
>
> (ii) those conditions put the [detainee] at substantial risk of suffering serious harm;
>
> (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequence of the defendant's conduct obvious; and
>
> (iv) by not taking such measures, the defendant caused the [detainee's] injuries.[56]

---

[53] ECF No. 10 at 10–12, ¶¶ 57–66.  Smith also pleads this claim against the individual Wellpath defendants.  Those defendants' summary-judgment motion is not yet ripe for decision.  So I focus on the claim as it is pled against the Mitchells only.

[54] ECF No. 144 at 20–35.

[55] ECF No. 150 at 3–14, 15–17, 20–21.

[56] *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022) (quoting *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)).  The parties agree that Nevada courts would use the same analysis under the Nevada Constitution.  ECF No. 144 at 20 (citing *Hernandez v. Bennett-Haron*, 287 P.3d 305, 310 (Nev. 2012) (finding that the due-process clauses in the U.S. and Nevada constitutions are similar, permitting Nevada courts "to look to federal precedent for guidance" on

The third element of this claim "requires [the plaintiff] to show that defendants' conduct was 'objectively unreasonable.'"[57]  "To prove objective unreasonableness, a plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard."[58]  "[M]ere lack of due care," an "inadvertent failure to provide adequate medical care," and "even medical malpractice, without more," are insufficient to meet this standard.[59]  The plaintiff must instead show that the defendant "disregarded an excessive risk to the plaintiff's health and safety by failing to take reasonable and available measures that could have eliminated that risk."[60]

### 2.   *The evidence does not create a genuine dispute of fact that the Mitchells acted with reckless disregard to Perea's medical needs.*

The Mitchells contend that the record shows without reasonable dispute that they appropriately monitored Perea during the final hours of his life and that their actions were not deliberately indifferent to his medical needs.  Vanessa asserts that the surveillance footage shows that she conducted signs-of-life checks every 15 minutes and she did not witness signs of Perea's medical distress until he was unresponsive at 1:45 a.m., at which point she called for emergency medical assistance and began chest compressions.[61]  Don'te maintains that the evidence shows only that he completed one signs-of-life check on Perea earlier in the evening, was in and out of

---

state claims)); ECF No. 150 at 3–4 (analyzing both constitutional claims under the federal standard).

[57] *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021) (quoting *Gordon*, 888 F.3d at 1125) (applying same test under the Fifth Amendment because the acting officials were federal immigration officers).

[58] *Id.* (cleaned up).

[59] *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Gordon*, 888 F.3d at 1125; *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

[60] *Id.* (cleaned up).

[61] ECF No. 144 at 23–28.

the video-monitoring area during the night of Perea's death, and responded to Vanessa's call for assistance when Perea was found unresponsive.[62]  The Mitchells argue that no reasonable jury could conclude that their acts were objectively unreasonable or constituted reckless disregard for Perea's well-being.

Smith offers a different characterization of the Mitchells' actions.  As she describes it, the evidence instead shows both Mitchells witnessing (and ignoring) Perea's fall at 12:51 a.m., less than an hour before Perea became unresponsive.  She compares the surveillance footage of Perea's cell with the footage of the corridor outside of his cell to suggest that Vanessa was in the exterior room of Perea's cell and could see him through the window at the exact moment that he fell, but she did nothing.[63]  Smith also contends that the video shows Don'te at the officer's station at that time, "where he appears to be looking in the direction of the monitors and TV displaying video feeds from the 2C in-cell cameras."[64]  She relies on Vanessa and Don'te's deposition testimony, in which they both acknowledged that they were trained to treat a fall as a cause for concern and to call colleagues or contact medical staff if they see an inmate fall.[65]  Smith argues that the video evidence supports an inference of further deliberate indifference from 12:51 a.m. to 1:45 a.m. because it shows Don'te and nonparty Christy Snapp at the video-monitor station "fraternizing with one another and a third officer" while Perea's in-cell camera shows him exhibiting signs of medical distress.[66]

---

[62] *Id.* at 28–29.

[63] ECF No. 150 at 5–6.

[64] *Id.* at 6.

[65] *See* ECF No. 144-15 at 26:15–17; ECF No. 144-16 at 57:24–58:7.

[66] ECF No. 150 at 6 (citing cell video and corridor video between 1:16 a.m. and 1:48 a.m.).

        *a.*      *Vanessa did not act with reckless disregard to Perea's health when she conducted signs-of-life checks every 15 minutes and did not see signs of distress.*

I cannot conclude on this record that a jury could adopt Smith's version of events concerning Vanessa's actions.[67]  The video surveillance shows that Vanessa conducted checks on Perea at least every 15 minutes, and often more frequently.  During each of those checks, Perea was not in obvious medical distress.  Though he fell at 12:51:50 a.m. and was laying on the ground until 12:51:53, when Vanessa arrived at his cell at 12:51:56 a.m., Perea sat up and looked at his cell door.[68]  During the minute that Vanessa was observing Perea, he did not fall or exhibit any signs of medical distress.[69]  When she came back at 1:04 a.m., Perea was sleeping on the cell's mattress.[70]  She came back at 1:19 a.m., while Perea was laying on the cushion positioned next to the bed.[71]  Vanessa checked on Perea again at 1:31 a.m., at which point Perea sat up on his bed and looked toward the front door.[72]  Perea never spoke to Vanessa, told her that he fell or felt unwell, or showed signs of illness when she was observing him.  A reasonable jury could not conclude on the basis of this evidence that Vanessa was aware that Perea was suffering from severe medical distress but made the intentional decision not to intervene, or that she disregarded an excessive risk to Perea's safety.

---

[67] *See Scott*, 550 U.S. at 380.

[68] *Compare* ECF No. 144-12 at 12:51:50–57 *with* ECF No. 144-13 at 12:51:50–57.

[69] *Id.*

[70] *See* ECF No. 144-12 at 1:04:00–1:05:00; ECF No. 144-13 at 1:04:00–1:05:00.

[71] *See* ECF No. 144-13 at 1:18:50–1:19:04; ECF No. 144-12 at 1:18:50–1:19:04.

[72] *See* ECF No. 144-13 at 1:31:45–1:32:08; ECF No. 144-12 at 1:31:45–1:32:08.

The record reflects that Perea's health deteriorated significantly between 1:32 a.m. and 1:44 a.m. During that brief window, he fell four times and showed signs of distress.[73] When Vanessa conducted her next scheduled signs-of-life check at 1:45 a.m. and noticed that Perea was unresponsive, she immediately knocked on the cell on the door and shined her flashlight onto Perea's face.[74] When he remained unresponsive, Vanessa called Don'te over to assist and called a medical-emergency code, then entered the cell and started chest compressions.[75] No reasonable jury could conclude that Vanessa's actions following her observation that Perea needed medical attention were deliberately indifferent to his needs.[76]

    b.  *Don'te was minimally involved in Perea's supervision and did not act with reckless disregard to his health.*

Smith's claim against Don'te also lacks evidentiary support. She contends that the video surveillance shows him at the officer's station at 12:51 a.m., "where he appears to be looking in the direction of monitors and TV displaying the video feeds from the 2C in-cell cameras."[77] Smith theorizes that the jury could infer from his presence near the monitors that he witnessed Perea fall and did nothing.[78] And she asserts that Don'te was also at the monitor station when Perea fell again at 1:16 a.m., but he was not looking at the "video monitor system right in front

---

[73] ECF No. 144-12 at 1:32:48–1:46:00.

[74] ECF No. 144-16 at 96:5–13.

[75] *Id.*; ECF No. 144-13 at 1:46:00–1:49:00.

[76] In Smith's response to the summary-judgment motion, she doesn't contend that Vanessa's 1:45 a.m. response was constitutionally deficient—she focuses instead on Vanessa's actions between 12:51 a.m. and 1:43 a.m., when Perea was intermittently showing signs of medical distress. But because Smith's complaint alleges deliberate indifference at every stage of Perea's detention, and Vanessa moves for summary judgment on this allegation, I briefly address it.

[77] ECF No. 150 at 6.

[78] *Id.*

of [him]" so he missed Perea's fall.[79]  She asserts that for the rest of the night, the officers were not paying adequate attention to the monitors and missed Perea's signs of distress.[80]  She insists that Metro's special-housing policy requires all officers to engage in constant video monitoring even when 15-minute checks are being performed, and she accuses Don'te of violating that policy.[81]

Even when I credit Smith's interpretation of the evidence, it does not rise to the level of a reckless disregard for Perea's well-being.  No reasonable jury could infer from the fact that Don'te was seated at the monitoring station that he in fact saw Perea fall.  The monitoring system consists of a TV mounted on the wall that displays the in-cell cameras of all cells at once.[82]  The two computer monitors at the table may display that same array of cells, but it may also display other systems that the officers log into during their shifts.[83]  There is no indication from the video that Don'te was actively monitoring the surveillance cameras, saw Perea fall, and failed to act.

Smith insists that Don'te violated Metro policy because he wasn't constantly monitoring the video screens while he was on shift.  But as Metro's Standard Operating Procedure (SOP) 09.08.03 explains, that monitoring job belonged to a third officer—in this case, Christy Snapp—who was assigned to monitor the closed-circuit video system and required to "make constant observations of inmates."[84]  Though officers assigned to visual checks are instructed to "use care to conduct such checks on an irregular schedule, including monitoring video surveillance of

---

[79] *Id.*

[80] *Id.*

[81] *Id.* at 7.

[82] *See* ECF No. 144-13; ECF No. 144-15 at 74:4–75:19.

[83] ECF No. 144-15 at 74:20–23.

[84] ECF No. 143-10 at 2–3 (SOP 09.08.03).

15

cells," the SOP does not require those officers to be constantly monitoring the surveillance feeds at any time they are not conducting visual checks.[85]

Even if Metro policy had required Don'te to regularly monitor the camera feeds, his failure to do so does not amount to a constitutional violation. The record reflects that there was an officer assigned to the video monitor throughout the evening, and the other officers—Don'te included—occasionally sat at the monitoring station. But for the most part, they were also conducting visual checks and attending to other duties throughout the evening. Indeed, Don'te was only at the monitoring station during two of Perea's falls earlier in the evening. During the remaining time that Smith accuses Don'te of being "entirely consumed with fraternizing with" other officers, he was not at the monitoring station at all or was merely stopping by to drink water.[86] Smith doesn't cite to any evidence suggesting that Don'te was required to be at that station throughout his shift and neglected his duties while knowing that doing so would put Perea at risk. Metro instead tasked Christy Snapp with the responsibility of vigilant monitoring on the night of Perea's death. Any failure on Snapp's part to monitor the cameras cannot be imputed onto Don'te.

---

[85] Smith relies on a snippet of Metro policy conveyed through a 2019 Internal Affairs Report regarding the death of a different inmate, Mark Abbe, *see* ECF No. 149-5 at 15 (citing "SOP 09.08.04 Post Outline – Restrictive Housing 2C and 2D"), which requires officers to "utilize the video system to make observations in between 15-minute checks[.]" That policy appears to be an outdated version of the one Metro attaches to its summary-judgment motion. Indeed, Metro presents evidence showing that it updated its policies to add a dedicated video monitor after Abbe's death. *See* ECF No. 150 at 20 (citing ECF No. 143-22 (mortality review for Abbe, noting that his death "prompted several changes to policy," including that "a third officer will be assigned to 2C-Male to utilize the video camera board system and provide continuous observations of the inmates")).

[86] *See* ECF No. 150 at 6 (citing the video surveillance at 1:16:45–1:17:30 (Don'te at monitoring station); 1:32:45–1:34:57 (Don'te not at monitoring station); 1:38:20–1:38:45 (Don'te not at monitoring station); 1:39:30–1:39:40 (Don'te not at monitoring station); 1:42:49–1:42:55 (Don'te not at monitoring station); 1:43:11–1:48:44 (Don'te briefly at monitoring station before performing signs-of-life checks and being called to Perea's cell by Vanessa).

> **c.** *Smith has not shown that the Mitchells should have known that Perea needed heightened monitoring because he was suffering from opiate withdrawal.*

Smith additionally theorizes that the Mitchells knew or should have known that Perea was "a particularly vulnerable individual whose medical complexity . . . required heightened monitoring."[87] She asserts that opiate withdrawal is a serious medical need and the Mitchells' failure to monitor him more closely or report his medical distress put him at substantial risk of harm.[88] The Mitchell defendants insist that they were entitled to rely on the medical judgment of the Wellpath nurses who returned Perea to the 2C cell without recommending monitoring in excess of what is normally conducted.[89]

Smith has not shown that Perea's state of opiate withdrawal made the Mitchells' monitoring of him inadequate. The record reflects that, after Perea was taken to the medical unit the night before his death because he was vomiting in his cell, the nursing staff approved his release back to the 2C unit without any special instructions to the officers for heightened monitoring.[90] Smith offers no evidence or law on which it can be found that the Mitchells recklessly disregarded Perea's needs by relying on the nursing staff's apparent conclusion that Perea was stable enough to return to 2C under normal monitoring conditions. So I find that the Mitchells are entitled to judgment as a matter of law with respect to Smith's theory that their

---

[87] ECF No. 150 at 8.

[88] *Id.*

[89] ECF No. 144 at 21.

[90] I make no findings or conclusions in this order about whether the individual Wellpath nurses and doctors acted reasonably when making any decisions regarding Perea's care. I find only that, based on what the Mitchells knew about Perea's condition at the time, they cannot be held liable for failing to monitor him more closely than they did.

17

failure to apply heightened monitoring when Perea was returned to 2C was constitutionally deficient.

In sum, I conclude that the Mitchells did not violate the Fourteenth Amendment of the U.S. Constitution or Article I, § 8 of the Nevada Constitution because they did not act with reckless disregard to Perea's medical needs on the night of his death. His deteriorating health was most obvious during a short, 15-minute window that was unfortunately not interrupted by one of Vanessa's consistent checks on his well-being. And though Perea's decline may have been noticed had non-party Christy Snapp been actively monitoring the surveillance cameras as required by Metro policy, Snapp's actions cannot be imputed to Don'te, and his actions were not deliberately indifferent to Perea's needs.

> d.    *The Mitchells are entitled to qualified immunity because their actions did not violate clearly established law.*

The Mitchells contend that, even if a genuine dispute of fact were to preclude judgment on the merits of Smith's Fourteenth Amendment claim, they would enjoy qualified immunity from it because their actions did not violate clearly established law. The qualified-immunity doctrine protects government officials "from money damages unless a plaintiff [shows] that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[91] The plaintiff bears the burden of showing that the right at issue was clearly established and "clearly prohibit[ed] the officer's conduct in the particular

---

[91] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)).

18

circumstances before [her]."[92]  Although the plaintiff need not identify a case "directly on point, existing precedent must have placed the statutory or constitutional question beyond debate."[93]

Smith defines the right at issue here as the "right to adequate medical care as a pretrial detainee, which includes the right not to have corrections officers ignore obvious signs of life-threatening medical distress."[94]  She cites *Lemire v. California Department of Corrections and Rehabilitation*,[95] a 2013 Ninth Circuit case, for the well-established rule that failing to provide "life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference."[96]  In *Lemire*, two officers responded to a man-down call after an inmate hanged himself.[97]  The officers called a medical code and entered the cell, but they refrained from performing any life-saving measures for 15 minutes before medical staff arrived, even though the prisoner was "unconscious, unresponsive, and purplish in color . . . ."[98]  The court concluded that, although the failure to take life-saving action does not "create an automatic basis for liability in all circumstances," a jury could conclude that these officers were deliberately indifferent.[99]

When viewed in the light most favorable to Smith, the facts here are too distinguishable from those in *Lemire*.  Even if the facts conclusively showed that Vanessa or Don'te saw Perea fall at 12:51 a.m., Smith has not established that Perea's fall demonstrates "obvious need" in the

---

[92] *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

[93] *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009).

[94] ECF No. 150 at 16.

[95] *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013).

[96] ECF No. 150 at 16 (quoting *Lemire*, 726 F.3d at 1083).

[97] *Lemire*, 762 F.3d at 1082.

[98] *Id.*

[99] *Id.* at 1083.

19

same way that the facts in *Lemire* did.  Indeed, at the point in which *Lemire* becomes relevant—when an officer became aware that an inmate was unresponsive in his cell—Vanessa did exactly what the officers in *Lemire* did not: she called for medical aid and began administering CPR.

Smith's reliance on *Sandoval v. County of San Diego* to aver that it is well-established that "a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition"[100] is similarly misplaced.  In *Sandoval*, correctional officers brought a detainee who was "sweating, tired, and disoriented" to the prison's medical station and told a nurse that the detainee needed an evaluation.[101]  The nurse gave him a blood-sugar test, conducted no other testing, and then left him alone in a cell without medical supervision for six hours.[102]

Smith has not shown that the Mitchells' actions come anywhere close to the constitutionally inadequate medical care displayed in *Sandoval*.  Even assuming that both officers saw Perea fall once, other monitoring around that time showed that he was alert and responsive.  This is not a case in which a prison employee left a detainee without any supervision for hours despite knowing that the inmate was unwell; Perea was getting checked on multiple times each hour.

I thus cannot conclude that *Sandoval* or *Lemire* provides the clearly established law that would have put the Mitchells on notice that their conduct was unconstitutional.  And I have not independently discovered any other Ninth Circuit or Supreme Court cases clearly establishing

---

[100] *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 679–80 (9th Cir. 2021) (citing *Jett v. Penner*, 439 F.3d 1091, 1097–98 (9th Cir. 2006)).

[101] *Id.* at 663, 670.

[102] *Id.* at 663.

that missing signs of a prisoner's distress while conducting sign-of-life checks every 15 minutes or being in the vicinity of camera feeds that showed the prisoner's distress can constitute deliberate indifference to the prisoner's medical needs under the Fourteenth Amendment. So Vanessa and Don'te Mitchell are also entitled to qualified immunity from Smith's Fourteenth Amendment claim.[103]

### 3. *Smith's loss-of-familial-association claim fails on this evidentiary record.*

Smith's second claim alleges deprivation of familial association in violation of the Fourteenth Amendment of the U.S. Constitution and Article I, § 8 of the Nevada Constitution.[104] The Ninth Circuit has recognized "that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children."[105] Only "official conduct that shocks the conscience in depriving parents of that interest is cognizable as a violation of due process."[106] If the official has the time and ability to deliberate before taking action, "then an officer's deliberate indifference may suffice to shock the conscience."[107]

Smith relies on the same set of facts to support her loss-of-familial-association claim against the Mitchells as she does to support her inadequate-medical care claim against them. Those facts fail to prove her second claim for the same reasons that they fail to create a genuine dispute of fact to defeat summary judgment on her first claim. The record evidence, especially

---

[103] The Mitchells also contend that they are entitled to discretionary immunity on Smith's deliberate-indifference claim under the Nevada Constitution. I need not so do not address this argument because I have concluded that Smith hasn't presented evidence to show that the Mitchells provided inadequate medical care in violation of the state's due-process guarantees.

[104] ECF No. 10 at 13–14, ¶¶ 67–73.

[105] *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)).

[106] *Id*. (cleaned up).

[107] *Id*. (cleaned up).

the surveillance footage of the Mitchells' actions in the early morning of July 12th, would not permit the jury to conclude that Vanessa or Don'te acted with deliberate indifference to Perea's medical needs.  So the Mitchells are entitled to judgment on Smith's loss-of-familial-association claim under the U.S. and Nevada Constitutions.[108]

### 4. Smith has not shown a genuine dispute of fact that the Mitchells breached their duty of care to Perea, so they are entitled to summary judgment on her wrongful-death claim.

Smith also asserts a state-law wrongful-death claim against the Mitchells.[109]  A wrongful-death claim is "premised on negligent conduct," so to prevail on a wrongful-death claim, a plaintiff must show "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages."[110]  The Mitchells seek summary judgment on this claim.[111]

They first contend that Smith hasn't established the duty of care that should apply in this case.  The Nevada Supreme Court has held that when a case involves conduct that is "not within the common knowledge of laypersons, the applicable standard of care must be determined by expert testimony."[112]  The Mitchells assert that the duty of care governing a correctional officer's monitoring of inmates in special-housing units is not obvious and, because Smith failed to produce an expert opinion establishing the standard of care, she cannot prevail on this claim.

---

[108] The Mitchells also contend that Nevada has not recognized this claim under its Constitution, so Smith's state-law claim fails as a matter of law.  I need not so do not address this argument because I find that, even if Nevada does recognize such a claim, Smith cannot prove it here.

[109] ECF No. 10 at 19–20, ¶¶ 101–07.

[110] *Sanchez ex rel. Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1280 (Nev. 2009).

[111] ECF No. 144 at 40–45.

[112] *Boesiger v. Desert Appraisals, LLC*, 444 P.3d 436, 439 (Nev. 2019) (cleaned up); *see also Daniel, Mann, Johnson & Mendenhall v. Hilton Hotels Corp.*, 642 P.2d 1086, 1087 (Nev. 1982) (explaining that expert testimony is not required if the conduct at issue doesn't involve "esoteric knowledge or uncertainty that calls for the professional's judgment").

Smith counters with three different sources from which a jury could come to an agreement on the standard of care in this case. She first contends that the duty is within the common knowledge of laypersons: "Any reasonable layperson can understand that when a corrections officer observes an inmate collapsing in his cell, the officer should summon medical assistance."[113] She alternatively suggests that her expert did establish a standard of care when he opined that "neither clinical staff nor security staff were paying adequate attention" to Perea's condition and that "CCDC staff took no action to check on [] Perea during the nearly twenty minutes before he was found dead and cold to the touch in his cell."[114] The expert also opined that the National Commission on Correctional Health has "made very clear that remote video monitoring is not sufficient for ensuring the safety of seriously ill patients," so "when an actively suicidal inmate is housed alone in a room, continuous monitoring by staff should be maintained."[115] Finally, Smith contends that Metro's own internal policies and procedures can supply the basis for a duty of care, and they required visual welfare checks every 15 minutes and continuous monitoring of video feeds to identify signs of medical distress.[116]

Assuming without deciding that Smith's combination of sources could establish a standard of care that included the duties to (1) summon medical assistance when an officer sees an inmate collapsing in his cell; (2) conduct visual welfare checks every 15 minutes; and (3) continuously monitor inmates with medical conditions or suicidal ideations through a video feed, the evidence does not show that Vanessa or Don'te breached that duty of care. Vanessa did conduct checks every fifteen minutes, the evidence does not show that she witnessed Perea fall

---

[113] ECF No. 150 at 17–18.

[114] ECF No. 144-19 at 30–31.

[115] *Id.*

[116] ECF No. 150 at 19.

or exhibit other signs of medical distress, and she immediately summoned medical assistance when she found Perea unresponsive. Smith has not shown that Don'te was or should have been responsible for continuous monitoring of the video feeds when it was Snapp who was assigned to that task, and Don'te was performing tasks away from the officer station during the bulk of Perea's decline. So I conclude that the Mitchells are entitled to summary judgment on Smith's wrongful-death claim because the evidence does not create a genuine issue of fact that their conduct breached the duty of care that Smith contends applies here.

### 5. *The Mitchells are entitled to summary judgment on Smith's neglect-of-a-vulnerable-person claim because it is premised on the same conduct as her wrongful-death claim.*

Smith's final claim is for neglect of a vulnerable person under NRS 41.1395.[117] The Mitchells move for summary judgment on this claim, arguing that NRS 41.1395 is a provision for special damages, and it does not give rise to an independent cause of action.[118] Some judges in this court have reached that conclusion, but the Nevada Supreme Court recently issued an opinion referring to NRS 41.1395 as a "statutory cause of action" and distinguishing an elder-abuse claim under that statute from other negligence claims.[119] So because it appears that Nevada's high court treats NRS 41.1395 as a statute that gives rise to a cause of action, the Mitchells are not entitled to summary judgment on that basis.

Recognizing NRS 41.1395 as creating a distinct cause of action does not save Smith's claim, however. She confirms that her neglect-of-a-vulnerable-person claim "arise[s] from the same factual allegations regarding the Mitchell [d]efendants' failure to respond to [Perea's]

---

[117] ECF No. 10 at 20–21, ¶¶ 108–115.

[118] ECF No. 144 at 40.

[119] *See Yafchak v. S. L.V. Med. Invs., LLC*, 519 P.3d 37, 39–40 (Nev. 2022).

24

obvious medical emergency" that undergird her wrongful-death claim.[120]  Because the evidence does not support that characterization of the Mitchells' actions, I find that they are entitled to summary judgment on this state-law claim, too.

**B.      Metro is entitled to summary judgment on all claims but the one premised on Wellpath's policy of chronically understaffing its medical team.**

Smith claims that Metro is liable for violations of Perea's constitutional rights based on two municipal-liability theories under *Monell v. Department of Social Services of New York*:[121] (1) the failure to adequately train its employees and (2) maintaining official customs and policies that were the moving force behind Perea's death.[122]  For both theories, Smith alleges that Metro failed to properly screen, house, monitor, and medically treat CCDC inmates with mental and physical illnesses.[123]  Smith also contends that Metro can be held vicariously liable under state law for wrongful death and neglect of a vulnerable person.[124]

Metro moves for summary judgment on all of these claims.[125]  It first contends that it cannot be held constitutionally liable under *Monell* because the individual Metro defendants in this case (Vanessa and Don'te) did not commit any constitutional violations.  Metro further asserts that it properly trained, supervised, and disciplined the officers involved in this matter and that its restrictive-housing policy is constitutionally adequate.  Finally, Metro argues that it

---

[120] ECF No. 150 at 20.

[121] *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).

[122] ECF No. 10 at 14–17, ¶¶ 74–88.

[123] *Id.* at 14–16, ¶¶ 76, 83.

[124] *Id.* at 19–21, ¶¶ 103, 115.

[125] ECF No. 143.

cannot be held liable for Wellpath's policies or customs because Metro didn't contract with Wellpath—Clark County did.

Smith responds that Metro can be held liable under *Monell* even if an individual defendant did not commit a constitutional tort if a policy or practice itself was the moving force behind the constitutional violation.[126]  She points to two Metro policies and practices—(1) isolating suicidal inmates who are undergoing detox, and (2) choosing to contract with Wellpath despite the company's reputation for providing inadequate care—that she contends violate the Fourteenth Amendment.  And she argues that because Metro is Clark County's designee for all CCDC operations, it is on the hook for Wellpath's policies.  Smith theorizes that Metro can be held liable for Wellpath's alleged policy of forcing inmates to undergo withdrawal without the assistance of tapering drugs like methadone or buprenorphine, its constitutionally deficient withdrawal-monitoring protocols, and its chronic understaffing of the medical staff at CCDC.  Finally, Smith claims that the deaths of two other CCDC inmates under circumstances similar to Perea's show Metro's widespread pattern of failing to adequately train its officers to monitor detoxing detainees.

### 1. *Metro may be held liable for policies that cause a constitutional violation, including Wellpath's policies.*

#### a. *Municipal actors can be liable for constitutionally deficient policies that cause the deprivation of constitutional rights.*

Metro contends that all of Smith's *Monell* claims against it fail because Vanessa and Don'te Mitchell did not violate Perea's constitutional rights.  It asserts that this is a necessary element of any *Monell* claim.[127]  But "municipal defendants may be liable under § 1983 even in

---

[126] ECF No. 149.

[127] ECF No. 143 at 10.

26

situations in which no individual officer is held liable for violating a plaintiff's constitutional rights."[128]  If a plaintiff can establish that he suffered a constitutional deprivation as "a consequence of [municipal] policy," the municipality may be liable even if "no individual officer is named as a defendant."[129]  The Ninth Circuit has reasoned that a municipal defendant may be held liable for constitutional deprivations stemming from the municipality's "fail[ure] to ensure compliance with its written policy," "fail[ure] to assure proper monitoring of its security cameras,"[130] and "failure to train its police officers even though no individual defendants were sued."[131]  So I deny Metro summary judgment to the extent that it contends that the law prevents it from being held liable unless an individual is too, and I instead reach the merits of Smith's claim that some Metro policies caused Perea to experience inadequate medical care and monitoring that ultimately led to his death.

> b.    *Metro has not shown that it cannot be held liable for Wellpath's allegedly unconstitutional policies and practices.*

It is well-established that "[c]ontracting out prison medical care does not relieve the [government contractor] of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the [government's] prisons of the means to vindicate" their constitutional rights.[132]  Metro concedes this general principle but argues that it didn't contract with Wellpath; Clark County did.  Metro contends that it is a separate legal entity from Clark County and it cannot be held liable for the actions of a corporation that it does not have a

---

[128] *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).

[129] *Fairly v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002).

[130] *Horton*, 915 F.3d at 604–05.

[131] *Fairly*, 281 F.3d at 917 (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)).

[132] *West v. Atkins*, 487 U.S. 42, 56 (1988).

contractual relationship with.  It cites Nevada Revised Statute (NRS) 211.140(4) for the proposition that "Clark County holds the authority to select and hire the medical provider at CCDC."[133]

Metro's argument ignores other key statutes and evidence.  NRS 211.140(4) states that the "sheriff, chief of police[,] or town marshal shall arrange for the administration of medical care required by prisoners while in his or her custody" and charges the county with merely "pay[ing] the cost of appropriate medical treatment."[134]  The only sheriff in Clark County is the one who leads Metro, so the statute actually designates the power to select a medical provider to Metro's Sheriff.[135]  Nevada law also unambiguously gives the sheriff "charge and control over all prisoners committed to his or her care in the respective county jails."[136]  And though the contract for Wellpath's services is between Wellpath and the County, the contract expressly provides that Metro "is the County's designee for all operations of CCDC[.]"[137]  Metro's Rule 30(b)(6) witness also testified that a Metro employee is responsible "for reviewing compliance with the contract" and that the county was involved mainly because the CCDC is "funded by the county."[138]

---

[133] ECF No. 143 at 7 n.2.

[134] Nev. Rev. Stat. § 211.140(4).

[135] *See* Nev. Rev. Stat. §§ 280.280(1) (noting that, upon formation of a metropolitan police department in lieu of separate city and county police departments, "every power and duty conferred or imposed by law upon a county sheriff . . . devolves automatically upon the department"); 280.284 (noting that a metropolitan police department "may enter into a contract with a county or any participating city for the operation or maintenance, or both, by the department with its own employees of a jail established by the other contracting party").

[136] Nev. Rev. Stat. § 211.140(1).

[137] ECF No. 143-7 at 3.

[138] ECF No. 149-10 at 25:20–23; 29:20–22.  *See also id.* at 30:11–14 (explaining that Metro "handle[s] the operations of the facility, but when it comes to contracts and the details in the contract, that's when the county financing is still involved with that").

Metro has not established that it should not be held liable for Wellpath's customs and policies. It appears that, though Clark County was the named party on the contract, Metro had the authority to select a medical provider and oversaw the provider's actions in the prison. Nevada's statutory scheme for CCDC supports this conclusion. So for the purposes of deciding this motion, I treat Wellpath's policies as Metro's policies.

          *c.*     *Municipalities may face § 1983 liability if their policies, customs, or practices cause a constitutional violation.*

To hold a municipality liable under § 1983, a plaintiff must show "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'"[139] A plaintiff can meet the second factor by showing that the municipality has "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker."[140]

### 2. Smith has not presented evidence of Metro's failure to train officers involved in Perea's care.

Smith alleges in her third claim for relief that Metro failed "to adequately train and supervise officers tasked with monitoring vulnerable inmates" like Perea.[141] She contends that Metro was on notice of systemic deficiencies relating to signs-of-life checks and video monitoring, and that Metro's failure to provide additional training and supervision on those

---

[139] *Oviatt By and Through Waugh v. Pierce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton*, 489 U.S. at 389–91).

[140] *Horton*, 915 F.3d at 602–03.

[141] ECF No. 149 at 18.

issues "created a dangerous environment [in which] officers routinely fail to perform life-saving monitoring duties."[142]

"A municipality's culpability for a deprivation of rights is at its most tenuous [when] a claim turns on a failure to train."[143] To prevail on this theory, a plaintiff must show that "a municipality's failure to train its employees in a relevant respect . . . amount[s] to deliberate indifference to the rights of persons with whom the untrained employees come into contact."[144] Deliberate indifference in this context requires "proof that a municipal actor disregarded a known or obvious consequence of his action."[145] If a municipality is "on actual or constructive notice that a particular omission in [its] training program causes [municipal] employees to violate citizens' constitutional rights," it can be held liable under § 1983.[146] "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."[147] "[I]n a narrow range of circumstances," however, a plaintiff may prevail on a single-incident-liability theory if "the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations."[148]

---

[142] *Id*. at 19.

[143] *Connick v. Thompson*, 563 U.S. 51, 61 (9th Cir. 2011).

[144] *Id.* (cleaned up).

[145] *Bd. of Comm'rs of Bryan City v. Brown*, 520 U.S. 397, 410 (1997).

[146] *Connick*, 563 U.S. at 61.

[147] *Id.* at 62.

[148] *Id.* at 63–64.

Metro contends that Smith cannot prove that its training programs related to monitoring inmates housed in 2C were constitutionally inadequate or caused the deprivation of Perea's rights. It also asserts that Smith cannot show that there was a pattern of constitutional violations in similar situations that would have put it on notice that its training was deficient. Smith responds with evidence of two prior incidents in which 2C detainees died under similar circumstances, and she contends that those incidents constitute a pattern of unconstitutional conduct that put Metro on notice of the deficiencies in its training.

> a.    *Smith has not met her burden to show a pervasive pattern of constitutional violations that would put Metro on notice of deficient training practices.*

Smith argues that the deaths of these two detainees—Mark Abbe and Kevin Lewis—show a pattern of "falsified, missing, and late signs-of-life checks; ignored signs of distress; and failures to utilize 2C's video monitoring systems" that caused the death of CCDC inmates.[149] In 2019, Abbe was housed in the 2C unit for observation because he made suicidal statements at booking and had visible track marks requiring "that he [be] placed on detox protocol."[150] He was found unresponsive in his cell less than 48 hours after being detained, and he was pronounced dead soon after.[151] Metro's investigation into Abbe's death revealed that several officers had failed to conduct or falsified signs-of-life checks, failed to properly monitor the video surveillance system, and ignored obvious signs of Abbe's medical distress.[152] In 2020, Lewis was placed on suicide watch in unit 2C and later died in custody.[153] Smith contends that

---

[149] ECF No. 149 at 19 (cleaned up).

[150] ECF No. 149-5 at 4.

[151] *See id.* at 3–4.

[152] *See id.* at 13–21.

[153] *See* ECF No. 149-9 at 82–83 (CCDC mortality reviews).

the evidence of Lewis's death shows that he fell to the ground but the officers did not respond.[154] Nine minutes later an officer conducted a visual check, found Lewis unresponsive, and called a medical-emergency code.[155]

Assuming without deciding that these two incidents are similar enough to Perea's, they are still insufficient to show that Metro had a pervasive pattern of failing to conduct welfare checks, intermittently monitoring in-cell surveillance footage, or ignoring signs of inmate distress that put Metro on notice of training deficiencies related to those issues. "Absent a formal governmental policy," a plaintiff must show a "longstanding practice or custom" that is so "persistent and widespread" that it effectively "constitutes a permanent and well settled [municipal] policy."[156] Two incidents do not show that Metro engaged in a longstanding practice of failing to adequately monitor the inmates housed in the 2C unit. And Smith does not contend that the need for additional training to address monitoring 2C inmates was so obvious that Metro "can reasonably be said to have been deliberately indifferent to the need."[157] So because a reasonable jury could not conclude from this evidence that Metro was on actual or constructive notice of any training deficiencies that contributed to Perea's death, I grant Metro summary judgment on Smith's failure-to-train claim.[158]

---

[154] ECF No. 149 at 19–20.

[155] ECF No. 149-9 at 82–83.

[156] *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (first quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992), then quoting *Monell*, 436 U.S. at 691).

[157] *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 793–94 (9th Cir. 2016) (citing *City of Canton*, 489 U.S. at 390)).

[158] Because this conclusion is dispositive of Smith's failure-to-train claim, I need not so do not address the parties' other arguments about this claim.

32

               *b.*      *Smith has not come forward with evidence to support her failure-to-discipline or failure-to-supervise claims.*

As part of Smith's failure-to-train claim, she also alleges that Metro failed to adequately supervise the officers monitoring 2C inmates and did not properly discipline wrongdoers.[159] Metro contends that Smith can't show a pattern of inadequate supervision or lax discipline regarding inmate monitoring that could amount to an official policy of unconstitutional inaction.[160] It also asserts that its policies governing the investigation of inmate deaths sufficiently provide discipline for officers who did not comply with prison policies.[161] It presents evidence showing that those policies were followed in Perea's case and that Christy Snapp was reprimanded following an investigation finding that she did not adequately monitor the 2C surveillance cameras on the night of his death.[162]

Smith does not identify a widespread practice of Metro failing to adequately supervise or discipline its officers under similar circumstances. At best, she notes that, though "several officers were disciplined in connection with Mr. Abbe's death," none of the officers in Perea's

---

[159] ECF No. 10 at 14–16, ¶¶ 74–81. Claims alleging a municipality's failure to discipline or supervise employees are evaluated under the same standards as a failure-to-train claim. *See Gillette*, 979 F.2d at 1349 ("A section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded."); *Jackson v. Barnes*, 794 F.3d 755, 763 (9th Cir. 2014) (applying the same standards to a failure-to-supervise claim).

[160] ECF No. 143 at 14–16.

[161] *Id.* at 14–15 (citing ECF No. 143-15 (depo. of Metro's Rule 30(b)(6) witness Jason Leavitt, in which he testified to the investigation process followed after every inmate death); ECF No. 143-16 (LVMPD Policy 5-206.12 Crime Scene Investigation); ECF No. 143-17 (LVMPD Policy 5-109.04 Critical Incident Review); ECF No. 143-18 (LVMPD Manual, Internal Oversight and Constitutional Policing Bureau).

[162] *Id.* at 15–16.

case (other than Snapp) were investigated or disciplined.[163]  This is insufficient to show that Metro maintains a custom of failing to supervise or discipline its officers.  So I grant summary judgment in Metro's favor on Smith's failure-to-train, failure-to-discipline, and failure-to-supervise claims.

### 3.    *Smith has not shown that Metro's policy of isolating suicidal inmates who are undergoing detox was the moving force behind Perea's death.*

Smith's fourth claim for relief alleges that Metro "maintained constitutionally inadequate policies, customs, and procedures with respect to properly screening, assessing, housing, monitoring, treating, and caring for detainees in their custody[.]"[164]  Metro argues that it is entitled to judgment on Smith's theory that it has unconstitutional written policies that contributed to Perea's death.  In response, Smith focuses on just one Metro policy: CCDC "required any inmate reporting suicidal ideations—whether on detox protocol or not—to be housed in isolation in restrictive housing in unit 2C, rather than a medical observation unit."[165]  She cites to her expert's report assessing Perea's housing and conclusion that Perea was placed "in an isolation setting, away from clinical surveillance."[166]  The expert opined that housing Perea in unit 2C did not conform to U.S. Department of Justice standards stating that "isolating patients who are experiencing withdrawal is not recommended due to the increased risk of self-harm."[167]  The expert also concluded that the policy of isolating detoxing patients was "at the heart of [] Perea's death because of the complexity of facing substance use withdrawal while

---

[163] ECF No. 149 at 20.

[164] ECF No. 10 at 16, ¶ 83.

[165] *Id.* at 17.

[166] ECF No. 144-19 at 30.

[167] *Id.* (quoting *Guidelines for Managing Substance Withdrawal in Jails*, USDOJ (June 6, 2023)).

locked alone in a cell" and noted that while suicide watch was probably appropriate for detoxing patients, placing Perea in the suicide-watch unit "should not have precluded adequate medical monitoring."[168]

Metro counters with evidence that Smith's expert relied on assumptions that are not supported by the record when making his conclusions. The expert assumes that placement in 2C "precluded adequate medical monitoring."[169] But Metro presents evidence that, though Perea was alone in his cell, he was not cut off from monitoring or medical services. Metro's policies required welfare checks on 2C inmates every 15 minutes and constant monitoring via surveillance feeds.[170] Each 2C cell contained a call button that an inmate could use to summon assistance.[171] A medical unit was on the same floor and was situated "less than a minute" from Perea's cell.[172] And medical appointments and daily visits from providers were available to 2C inmates.[173] On this record I cannot conclude that the policy of placing Perea in unit 2C rather than a medical-observation unit "precluded adequate medical monitoring" as Smith's expert contends.

The record also doesn't support a finding that Metro's restrictive-housing policy was the moving force behind Perea allegedly receiving constitutionally inadequate medical care. There is no evidence in the record that medical staff could not provide care to Perea in the 2C unit or that his placement there hindered his ability to receive medications or seek assistance if needed.

---

[168] *Id.*

[169] *Id.*

[170] ECF No. 143-10 at 2–3 (SOP 09.08.03).

[171] ECF No. 143-25 (photo of cell's call light); ECF No. 143-26 at 3, ¶¶ 7–8 (decl. of Metro Captain Nina Schmidt).

[172] ECF No. 143-9 at 68:10–23; *see also* ECF No. 144-27 at 158:4–12.

[173] ECF No. 143-9 at 72:5–14; 80:14–25.

In so finding, I do not consider Smith's expert's opinions on this point because "[e]xpert testimony cannot create a genuine issue of material fact if it rests on assumptions that are not supported by the evidence," and here, they are not.[174]  So I grant Metro summary judgment on Smith's theory that Metro's official policy of housing in unit 2C suicidal inmates who are also detoxing is unconstitutional.

### 4.  Smith has not shown that Metro violated Perea's constitutional rights by contracting with Wellpath despite its alleged reputation for inadequate care at other prisons.

Smith next contends that Metro's decision to use Wellpath as CCDC's medical provider was an official policy, custom, or practice that "demonstrates a deliberate choice to prioritize cost savings over constitutional compliance."[175]  She relies on news articles, complaints in other district-court cases, and federal investigations of Wellpath's provision of medical services at other prisons before it became CCDC's provider to suggest that Metro knew or should have known that Wellpath would provide constitutionally inadequate care.[176]  Smith asks this court to take judicial notice of those publications "to indicate what was in the public realm at the time" that Metro and the County's selection committee completed a vetting process into potential medical providers.[177]  Metro responds that this court cannot take judicial notice of the truth of the

---

[174] *See Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) ("Expert testimony cannot create a genuine issue of material fact if it rests on assumptions that are not supported by evidence.").

[175] ECF No. 149 at 21.

[176] *Id*. at 20–24.

[177] *Id.* at 21 (quoting *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (taking judicial notice of "various newspapers, magazines, and books . . . solely as an indication of what information was in the public realm at the time")).

36

facts conveyed in those articles and that Metro consistently audited and monitored Wellpath to ensure that it was providing adequate care.[178]

I cannot conclude that news articles and investigations concerning Wellpath's conduct at other prisons create a genuine dispute of fact concerning whether Metro knew that contracting with Wellpath would create a risk to prisoner health and consciously chose to make that choice anyway. Even if I assume that those articles would have come across the desks of officials on the selection committee, I cannot assume that they accurately depict the circumstances present at those prisons.[179] Nor has Smith shown that the decision to contract with Wellpath was somehow the "moving force" that caused Perea's death. This theory is simply far too attenuated from the evidence surrounding Perea's death to survive summary judgment.

### 5. *Smith has not shown that Wellpath's policies for treating withdrawal were constitutionally inadequate.*

Smith next asserts that Metro can be held liable under her "official policy" claim for Wellpath's "forced withdrawal policy."[180] She contends that, "rather than providing the standard of care for acute opiate withdrawal—administering tapering doses of opiates like methadone or buprenorphine—Wellpath's policies only allowed providers to prescribe symptomatic medications like those for nausea."[181] She relies on her expert's opinion that Wellpath's policies "do not ensure the use of these medications for treatment of withdrawal."[182] The expert also

---

[178] ECF No. 162 at 16–19.

[179] *See Von Saher*, 592 F.3d at 960 (explaining that courts may not take judicial notice of publications for the purpose of showing that the "contents of those articles were in fact true" (citations omitted)).

[180] ECF No. 149 at 24.

[181] *Id.*

[182] ECF No. 144-19 at 28.

notes that the American Society of Addiction Medicine recommends the use of methadone or buprenorphine and specifically comments that "[i]ndividuals entering the criminal justice system should not be subject to forced opioid withdrawal."[183]  Metro responds that Wellpath's policy is not so limiting and that Smith hasn't shown that Metro was aware of a widespread custom of prescribing inadequate detox treatment.

Smith's expert again makes assumptions that are inconsistent with the evidence in this case.  Wellpath's policies for medically supervised withdrawal and medication-assisted treatment do not foreclose the possibility of prescribing methadone or buprenorphine to treat opioid withdrawal.[184]  And WellPath's Rule 30(b)(6) witness Lori Ann Coleman testified that while methadone would not be prescribed under the circumstances, buprenorphine was available at CCDC in 2021 if it was "clinically indicated and ordered by the provider."[185]  She explained that it may be prescribed "once the COWS score reaches 8, sometimes 12" and if a provider deems it necessary after an assessment of the patient.[186]  Coleman also identified various symptoms that might indicate that buprenorphine would be clinically indicated, such as elevated or significantly decreased vitals, shaking, yawning, or goosebumps.[187]

On this record, a jury could not reasonably conclude that Wellpath has a "forced withdrawal policy."  It establishes instead that buprenorphine was available if the medical staff assessed a patient and determined that it was clinically indicated.  And Smith does not make any

---

[183] Id.

[184] See ECF No. 149-7 (Wellpath Policy HCD-100_F-04–Medically Supervised Withdrawal and Treatment); ECF No. 149-11 (Wellpath Policy HCD-100_F04B–Medication-Assisted Treatment).

[185] ECF No. 149-3 at 115:3–9; 120:5–8.

[186] Id. at 115:13–21.

[187] Id. at 116:16–20.

showing that, despite its written policy, Wellpath had a widespread custom of declining to prescribe tapering medications even if they were clinically indicated, such that forced withdrawal became the de facto policy. Metro cannot be held liable for a policy that simply doesn't exist.

In making this finding I make no ruling concerning whether the individual Wellpath employees provided inadequate medical care when choosing not to prescribe this treatment for Perea. Courts throughout the country have acknowledged that symptoms of opiate withdrawal may constitute a serious medical need and thus require adequate medical care.[188] So it may be the case that Smith can maintain her inadequate-medical-care claim against the individual Wellpath defendants.[189] But to the extent that Smith claims that Metro is responsible for Wellpath's policies concerning withdrawal treatment, Metro is entitled to summary judgment in its favor.

### 6. *Smith has not shown that Metro knew of and disregarded risks associated with Wellpath's withdrawal protocols.*

Smith's next hook for *Monell* liability is that Metro can be held responsible for Wellpath's "persistent deficiencies with the very detoxing protocols designed to prevent deaths like" Perea's.[190] She points to evidence that Metro identified deficiencies in Wellpath's

---

[188] *See, e.g.*, *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 948 (N.D. Cal. 2015); *Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512–13 (7th Cir. 2005) (finding that inmate suffering from methadone withdrawal and exhibiting concerning systems had a serious medical need); *Ferguson v. Palm Beach Cnty. Sheriff's Dep't of Corrs.*, 797 F. Supp. 3d 1276, 1294 (S.D. Fla. 2025) ("Federal courts around the country have held that opioid use disorder, including the side effects of forced withdrawal from opioid use, is a serious medical need."); *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1030 (10th Cir. 2020) (finding that an inmate withdrawing from heroin and vomiting blood demonstrated a serious medical need).

[189] The individual Wellpath defendants were given an extension of time to file a summary-judgment motion in this case, so their liability is not before the court at this time.

[190] ECF No. 149 at 25.

protocols from 2019 through August 2021.[191]  At four Medical Administrative Committee meetings in which Metro and Wellpath employees were in attendance, COWS assessments were discussed as needing improvement.[192]  She also notes that three other inmates died from 2019–2020 while detoxing, and that text messages between Wellpath employees show that they were aware that Wellpath was not properly treating detox patients.

Metro responds that its continuous monitoring of Wellpath's deficiencies shows that it did not recklessly disregard those shortcomings but rather worked to resolve them.[193]  It relies on caselaw requiring "proof that a municipal actor disregarded a known or obvious consequence of his action" for *Monell* liability to attach.[194]  The minutes from the MAC meetings, Metro contends, actually note improvement in COWS assessments since the issue was identified, which demonstrates that Metro was pushing Wellpath to take corrective action.[195]

Viewing the facts in the light most favorable to Smith, I cannot conclude that a jury could infer that Metro knew of deficiencies in Wellpath's withdrawal protocols but recklessly disregarded their risks.  The meeting minutes Smith relies on show only that Metro and Wellpath representatives were working to correct unspecified deficiencies related to COWS assessments.  This is insufficient to suggest that Metro was aware of a problem but recklessly disregarded it.

---

[191] *Id.* (citing ECF No. 149-12 (Medical Administrative Committee meeting minutes)).

[192] *Id.*

[193] ECF No. 162 at 18.

[194] *Id.* (citing *Bell v. Williams*, 108 F.4th 809, 824 (9th Cir. 2024)).

[195] ECF No. 149-12 at 57 (minutes of June 8, 2021, meeting, reflecting that the committee is "continu[ing] to follow COWS/CIWA closely.  Has improved"), 58 (minutes from July 13, 2021, meeting, reflecting that "audits are being completed on a daily basis on Kites, CIWA/COWS to find the holes and correct them"), 60 (minutes of August 18, 2021, meeting reflecting that audits are continuing and that shift leads are getting more "involved with the audit process and editing their peers"), 69 (minutes of January 18, 2022, meeting reflecting that "CIWA/COWS have improved to high 90% group").

Smith's evidence of three deaths in the two years preceding Perea's death is also insufficient to show that Metro was aware of and chose not to ameliorate risks stemming from Wellpath's protocols. Smith generically cites to the mortality reviews of those three deaths but fails to show that those investigations attributed the deaths to Wellpath's withdrawal protocols.[196] Her text-message evidence between Wellpath nurses also doesn't support the inference that Metro failed to act on protocol deficiencies before Perea's death.[197] So I conclude that Metro cannot be held liable for Wellpath's alleged deficiencies in administering withdrawal protocols.

Smith contends then that Wellpath's official policy "of only conducting COWS assessments every eight hours" should cause liability to be imputed onto Metro.[198] She cites to her expert's report explaining that more frequent COWS assessments are essential to a detoxing patient's health and noting that DOJ guidelines recommend COWS assessments to be completed a minimum of every four hours for the first 72 hours of monitoring.[199] But Smith offers no evidence that Wellpath's policy didn't meet those standards.

Wellpath's Medically Supervised Withdrawal and Treatment policy states that COWS assessments should be conducted "No more than every 8 hours—more frequently if clinically

---

[196] *See* ECF No. 149-9 at 27 (mortality review for Shannon Taylor, who was "housed in detox due to her answers during the intake process," was transferred to a hospital after she complained of not feeling well, and died at the hospital soon after), 133–134 (mortality review for Drew Max, who died in an isolation unit after being transported from the medical-observation unit because he was "being disruptive"); ECF No. 149-5 (internal investigation into the death of Mark Abbe).

[197] *See* ECF No. 149-8 at (texts between Wellpath nurses in January 2022, in which one nurse predicts that a co-worker "will neglect all detoxer[s] and [they] will end up dying Sunday [u]nder [C]arol's care or useless admins care").

[198] ECF No. 149 at 26.

[199] ECF No. 144-19 at 29–30.

indicated."[200]  And Wellpath's representative testified that "no more than" meant that "there should be no more than eight hours between the assessments" and that a provider could assess her patient more frequently if she felt it was necessary.[201]  Though there may be questions of fact concerning whether the medical staff adequately applied these policies in Perea's case, the policy itself did not violate his rights and did not put Metro on notice of the risk of unconstitutional conduct stemming from the policy.  So I grant Metro summary judgment on the theory that it should be held liable for Wellpath's withdrawal policies or any pervasive deficiencies in administering those policies.

### 7. *Genuine disputes of fact preclude summary judgment on Smith's theory that Wellpath's chronic understaffing was one of the moving forces behind Perea's death.*

As her final *Monell* theory, Smith contends that Wellpath had a chronic understaffing problem that Metro knew about but ignored.  She cites to evidence showing that, on the night of July 10–11, 2021, a Metro officer emailed his supervisor describing a "fiasco that went on" with the Wellpath medical staff caused by inadequate staffing.[202]  He noted that a nurse from "Psych Services" was pulled from her other duties to assist the screening nurses on duty and that an inmate was having an asthma attack and wasn't timely treated.[203]  One of the Metro supervisors followed up with a Wellpath employee, noting that they had discussed this issue before and asked the Wellpath employee to "address this immediately."[204]

---

[200] ECF No. 149-7 at 6.

[201] ECF No. 149-3 at 139:9–18.

[202] ECF No. 149-13 at 5.

[203] *Id.*

[204] *Id.* at 6.

What happened over the evening of July 10th into the morning of July 11th is particularly relevant in this case. In the early morning of July 11th, Perea was taken to the medical unit because an officer "noticed blood vomit on the floor" of his cell.[205] Aynur Kabota, the nurse who observed Perea at that time, testified that she asked the nurse practitioner called to assess to go to 2C and see how much vomit was in Perea's cell, and the NP responded that she didn't have time.[206] Kabota then asked the NP to send Perea to a hospital and the NP again responded that she was "too busy" to take that step.[207] And on the morning that Perea died, Kabota commented in messages to a co-worker that she "was very short staffed" when she was treating him.[208]

Metro contends that this theory fails to establish *Monell* liability because there is no evidence that understaffing caused Perea's death, noting that "Perea undisputedly received medical treatment while at CCDC upon showing signs of distress."[209] But Smith's expert opines that Perea's treatment in the early hours of July 11th was woefully deficient and, had Perea been transferred to the hospital that morning instead of being returned to 2C, "he more likely than not would have survived his incarceration."[210] And based on the nursing evidence that Smith offers, I find that a reasonable jury could conclude that understaffing was a contributing cause of Perea's death from evidence that (1) Wellpath was understaffed the night Perea received allegedly deficient care, and (2) the NP observing him may have refused to transfer him because she "didn't have time."

---

[205] ECF No. 144-9 at 2.

[206] ECF No. 149-6 at 60:15–18.

[207] *Id.* at 60:25–61:8.

[208] ECF No. 144-26 at 6.

[209] ECF No. 162 at 6.

[210] ECF No. 144-19 at 33.

Metro also argues that this theory fails because it did not ignore understaffing issues. It required Wellpath to report "unstaffed hours" to the County because Wellpath was contractually obligated to "pay back penalties if [it does] not staff the facility based on what the contract" states.[211] Metro contends that the emails Smith relies on to show that an understaffing problem existed also show that Metro "diligently pushed Wellpath to meet staffing requirements when expectations were not met."[212]

But a reasonable jury could conclude from the evidence that Metro was aware of Wellpath's understaffing issue and didn't take appropriate corrective action to reduce the risk that it may negatively impact inmate care.[213] The evidence shows that understaffing was an issue specifically on July 10th and 11th, and that Metro officials were aware of similar issues occurring before that date.[214] It also appears that the problem persisted after Perea's death: in January 2022, an officer raised similar issues arising from "not enough nurses and Wellpath [] not staffing us correctly to properly and timely" provide medication.[215] A supervisor emailed a Wellpath employee noting that the situation was "unacceptable" and asking her to look into it.[216] The Wellpath employee acknowledged that the medical staff at CCDC was "extremely short-

[211] ECF No. 149-3 at 29:23–30:5.

[212] ECF No. 162 at 19.

[213] *See Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1078 (S.D. Cal. 2023) (denying summary judgment for county on *Monell* claim because the plaintiff pointed to evidence that the county knew of repeated medical-staff failures); *Gohranson v. Snohomish Cnty.*, 2018 WL 5921012, at *3 (W.D. Wash. Nov. 13, 2018) (denying summary judgment on *Monell* claim because evidence "could support the conclusion that the County was aware that the jail's policies and procedures—including staffing levels, written protocols, oversight mechanisms, and medical records—gave rise to a substantial risk that detoxing inmates and detainees would not receive adequate medical care").

[214] ECF No. 149-13 at 5–6.

[215] *Id.* at 10.

[216] *Id.* at 9.

staffed," noting that there were several open positions that hadn't been filled and that several employees were out sick.[217]  Metro officials followed up requesting that Wellpath notify them in writing what positions are short "and what active steps and/or plan . . . is being taken to address the shortages."[218]  But emails in February and March 2022 reflect continued issues with medical staff shortages.[219]  So at this stage there are genuine disputes of fact concerning Wellpath's inadequate staffing practices and Metro's knowledge of and response to them.  A jury thus will need to decide whether Metro can be held liable under *Monell* for Wellpath's chronic understaffing problems.

### 8.    *Metro is entitled to summary judgment on Smith's state-law claims.*

Metro also seeks summary judgment on Smith's state-law wrongful-death claim, contending that it cannot be held liable under a vicarious-liability theory because the Mitchells didn't violate any duty of care.[220]  But Smith expands her theory beyond the Mitchells, arguing that non-defendant officers "exhibited tortious and unconstitutional conduct when, while undertaking their official duties, they falsified, missed, or delayed vital signs of life checks, ignored signs of distress, and utterly failed to utilize 2C's video monitoring system."[221]  She asserts that, "[b]ecause material questions of fact exist regarding multiple [Metro] officers' tortious conduct, and [Metro] can be liable for any torts committed by its employees acting within the scope of their employment, summary judgment on [her] state law claims is

---

[217] *Id.*

[218] *Id.* at 14.

[219] *Id.* at 16–20.

[220] ECF No. 143 at 21.

[221] ECF No. 149 at 30.

inappropriate."[222]  Metro responds that Smith's complaint limited its vicarious-liability allegations to "the Individual Defendants' intentional, reckless, and negligent conduct" and that she should not be permitted to expand that claim to now sweep in officers who were not named as defendants in this lawsuit.[223]

Because I held supra that Vanessa and Don'te Mitchell did not breach any duty of care owed to Perea, Metro cannot be held vicariously liable for their actions.  And I will not consider Smith's belated attempt to expand her wrongful-death claim to sweep in individual officers who were not named as defendants in this matter.  The Ninth Circuit has condemned such conduct, noting that "[a]dding a new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under the new theory of liability."[224] Because expanding the scope of Smith's wrongful-death claim at this late stage in the proceedings would unjustly prejudice Metro, I decline to consider it.  So I grant Metro summary judgment on Smith's wrongful-death claim and her ancillary neglect-of-a-vulnerable-person claim.

**Conclusion**

IT IS THEREFORE ORDERED that Vanessa and Don'te Mitchell's motion for summary judgment **[ECF No. 144] is GRANTED**.  Vanessa and Don'te Mitchell are entitled to judgment on all of Smith's claims against them.  The Clerk of Court is directed to TERMINATE them as parties.

---

[222] *Id.*

[223] ECF No. 162 at 22 (citing ECF No. 10 at 19, ¶¶ 103–04).

[224] *See Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 744 (9th Cir. 2025) (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (cleaned up)).

46

IT IS FURTHER ORDERED that Metro's motion for summary judgment **[ECF No. 143]**

**is GRANTED in part and denied in part.** Smith's fourth claim for "policy and custom"

*Monell* liability against Metro proceeds to trial only on the theory that it can be held liable for

Wellpath's chronic understaffing that may have contributed to Perea's death in violation of the

U.S. and Nevada Constitutions. Metro is entitled to judgment on the rest of Smith's claims.

The court does not enter judgment at this time because a motion for summary judgment

brought by the individual Wellpath defendants remains pending.

_____

U.S. District Judge Jennifer A. Dorsey
March 26, 2026